| | | |
|---|---|---|
| United States District Court | | Southern District of Texas |

| | | |
|---|---|---|
| James J. Flanagan Shipping Corporation, | § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-08-2572 |
| Flexi-Van Leasing, Inc., | § § | |
| Defendant. | § § | |

# Findings of Fact and Conclusion of Law

1.  *Introduction.*

    A contract repair yard sued its customer, an equipment company, for its refusal to pay for work done. Despite its excuses, the equipment owner must pay.

2.  *Background.*

    In the context of truck transport of cargo containers, a chassis is a trailer – the metal frame, wheels, and lights – that trucks use to haul containers. The word *chassis* is both singular and plural. Drivers of truck tractors go to a yard to attach a chassis. Then they pull it to the wharf or dock-side yard to be loaded with a container, deliver the container to its consignee, and eventually return the chassis to a yard. Chassis constantly cycle through yards where they are checked-in, inspected, repaired, and checked-out to begin the use cycle anew.

    James J. Flanagan Shipping Corporation has a yard at the Barbours Cut Container Terminal of the Port of Houston where it inspects, repairs, and stores chassis for its customers, including Flexi-Van Leasing, Inc. Flexi-Van owns an inventory of chassis that it bails to its customers for hire for the carriage of containers from ports to locations across the country.

    In the fall of 2007, a dispute arose between Flanagan and Flexi-Van. Flanagan says Flexi-Van owes it approximately $500,000 for unpaid work. In response, Flexi-Van says Flanagan should reimburse it approximately $380,000 for work omitted and ill-performed.

3. *The Relationship and Business.*

The relationship between Flanagan and Flexi-Van began in 2004 when Flexi-Van acquired Xtra Chassis, Inc. Xtra had a contract with Flanagan to store and maintain its chassis since mid-2002. Xtra assigned the contract to Flexi-Van in November of 2004.

The contract specified the tariff – schedule of rates – that Flexi-Van would pay Flanagan for its work. In it, Flexi-Van agreed to pay Flanagan's invoices within forty-five days of receipt and to confer about problems arising out of the contract. Flanagan also agreed to allow Flexi-Van access to its records and yard to verify its work. For three years, the companies operated under this arrangement, and in August of 2007, they raised the tariff's labor rate to $54 per hour.

4. *The Operation.*

When a chassis arrived at Flanagan's yard, Flanagan would inspect it, record its condition on an interchange receipt, and estimate the cost of repairs. Ordinary wear and tear was not an item on the interchange receipt. As is customary both in the industry and between Flanagan and Flexi-Van, this initial inspection was cursory – a quick look for obvious defects. Problems that were not readily apparent – say, worn brake pads – would be found at the later, closer inspection.

Sometimes chassis would arrive stacked one on top of the one hitched to the tractor. On the interchange receipt for stacked chassis, Flanagan would note "status pending" because an inspection was not practical until they were unstacked. As a result of the cursory review and stacking, not all necessary repairs would be written on the interchange receipt, and Flexi-Van regularly paid for repairs that were not noted at interchange.

Flexi-Van authorized Flanagan to do all repairs costing less than $250. Under the written contract, Flanagan needed Flexi-Van's direct permission for repairs over $150, but the limit was modified by their course of conduct to $250. Probably because they raised the limit in later negotiated but unexecuted contracts to $250, the parties' conduct followed suit.

5. *Changing Needs.*

In May of 2007, when one of Flanagan's largest container customers – Mediterranean Shipping Company – withdrew, Flanagan reduced its staff. Flexi-Van then agreed with Flanagan that it would operate as a depot to store chassis. They also decided that Flanagan would receive,

repair, and release more chassis than it had done previously. Consequently, Flanagan's yard at Barbours Cut transformed from (a) an operation that stored containers and serviced some chassis to (b) a depot and servicer of chassis in an increased volume. Their relationship had evolved.

Flexi-Van soon began sending chassis to Flanagan at a higher rate, and by August, Flanagan had hired additional mechanics. Most weeks from April to July of 2007, the total of Flexi-Van's chassis in the yard ranged from about 160 to 280. In September, Flexi-Van's deliveries outpaced its releases, and on September 10, the chassis in Flanagan's yard rose to 492. By the end of October, the yard total reached 708 and peaked at 930 on November 23.

The number of moves – chassis checked into and out of the yard – also began to increase in September with 1,282 moves. In October, 2,292 moves occurred – far more than the 420 in May, the 754 in June, the 1,158 in July, and the 589 in August. The number of moves in November and December were 1,256 and 1,457. The second-highest number of moves occurred in January of 2008 with 2,128.

As it had done since the beginning of their relationship, Flexi-Van regularly visited Flanagan's yard to inspect the repairs and review the paperwork. During this 2007-2008 period, Eli Cortez, Flexi-Van's Houston pool manager, inspected Flanagan's operation about three times a month.

Flanagan, meanwhile, sent Flexi-Van weekly invoices for the work it had done. The invoices included (a) a table detailing the number of chassis repaired and the total for each, (b) repair estimates, and (c) interchange receipts. Cortez would then review the invoices for their accuracy, and Flexi-Van would pay the approved amounts. When Cortez found a discrepancy in the billing, he would promptly send Flanagan a notice that Flexi-Van was going to pay less than the billed amount. This notice was called a "short pay" and explained the deduction.

6.  Friction.

Cortez approved payment in full for seven invoices dated from September 28, 2007, to November 5, 2007, but Flexi-Van neither paid them nor sent an explanation. Flexi-Van, through Cortez and Monty Falls, its regional vice prsident, repeatedly assured Flanagan that the work was satisfactory and that it would pay. It continued to send Flanagan chassis and asked it to hire more mechanics. Back at the yard, the receivables continued to grow, reaching by February of 2008 over $600,000.

On February 8, 2008 – over four months after the disputed work had been done – Flexi-Van told Flanagan that it would pay only $143,000 and, for the first time, complained about serious problems with Flanagan's work and billing. It questioned invoices extending as far back as September of 2007. Edward DeMoll, pool manager for Flexi-Van, told Flanagan in the same e-mail that his review showed that Flanagan had no quality control measures and that its mechanics were overcharging for electrical repairs, airing of tires, adjusting of brakes, and testing of lights, among other complaints.

Flanagan pointed to audits that DeMoll and Cortez performed on January 9, 2008, that showed double-charging or billing for unperformed work. DeMoll audited Flanagan's yard again on February 13, 2008, and reported similar findings. On February 21, 22, and 26, 2008, Rodney Fernandez of Maritime Inspection Services audited Flanagan with Flexi-Van's assistance and issued an unfavorable report.

In March, Flexi-Van again audited Flanagan and seven other chassis yards with Erik Franco, an owner of a chassis-repair business that exclusively works for Flexi-Van. This audit also found problems with the work of Flanagan. Notably, Franco also found that Flanagan operated similarly to other chassis yards in Houston. Some of the verifications of work occurred after the chassis had left the yard and been returned.

In response, Flanagan hired independent auditors to review its work. In the first audit on March 14, 2008, General Marine Surveyor found that most of the repairs had been made and issued a favorable report. General Marine Surveyor returned on March 28, 2008, to audit another pool of chassis. It again found that repairs in the work orders had been done and found no evidence of "over writing."

7.  *Servicing the Chassis.*

Within commercially reasonable limits, Flanagan did the work underlying its invoices to Flexi-Van. For nearly three years, they worked together without incident. Through its regular site visits, Flexi-Van was directly familiar with exactly how Flanagan operated, how it billed, and whom it employed. If a problem had existed, Flexi-Van would have immediately known because of its frequent visits and weekly review of the invoices. These same invoices – until the dispute arose were promptly paid with modest short-pays.

Despite its strong efforts, Flexi-Van simply has not demonstrated that Flanagan's work was over-billed or improperly performed. Assuming the audits Flexi-Van conducted in January

2008 do show improprieties, they do not show that improprieties occurred in the months before the audits were conducted. The audits may only be considered for the period they covered. Flexi-Van did not attempt to offer a rigorous sampling of the population of trailers over the period of nonpayment.

The audits that Flexi-Van did and had done are unreliable because they compared repair orders with chassis that had left, been used, and been returned to the yard; the investigation was not done promptly after the service was rendered. Franco's audit must be discounted because his chassis-repair business's only customer is Flexi-Van, creating a significant conflict of interest that renders him anything but independent.

8.   *Waiver.*

The behavior of the contracting parties may modify the requirement to comply with some terms in the future. When one party repeatedly performs in a way that is inconsistent with the written terms, it may not be required to account to the variance, if the other party knows the precise nature of the variation and has an opportunity to object. *Seismic & Digital Concepts, Inc. v. Digital Resources Corp.*, 590 S.W.2d 718, 721 (Tex. App. – Houston [1st Dist.] 1979); Restatement (Second) of Contracts § 150 cmt. e (1981); Restatement (Second) of Contracts §246(1) (1981);

By waiting four months to dispute its invoices, Flexi-Van waived the right it may have had to question a bill; it waited until the evidence had gone. It waited years to demand strict performance, waiving it. Flexi-Van had more than ample opportunity to question how Flanagan repaired its equipment and billed it because it (a) regularly visited Flanagan's yard to inspect the work, (b) reviewed the invoices, and (c) checked the invoices against the chassis. Because Flexi-Van is a large business with many repair contractors, it had the data available for cross-checks with other yards. Worse than silence, Flexi-Van assured Flanagan it was happy with their relationship and to expect payment. Flexi-Van has no explanation for allowing four months of unpaid bills to accumulate before accusing Flanagan of improper work. It said it noticed billing improprieties months earlier but spent this time investigating. Its investigation did not include confering with Flanagan or asking for additional reports in the interim. Its investigation consisted of using Flanagan and assuring it that the check was about to be mailed. Regardless of Flexi-Van's suspicions, it consciously accepted Flanagan's performance. By accepting

Flanagan's services for almost three years plus the four months of unpaid bills, it accepted the practices – like incomplete interchange receipts – that it now wants to use to avoid its debt.

9. *Breach.*

To recover under a breach of contract, Flanagan must show (a) a contract; (b) its performance; (c) nonperformance of Flexi-Van's reciprocal obligations; and (d) its consequent damages from the breach. *Lewis v. Bank of America NA*, 343 F.3d 540, 544-45 (5th Cir. 2003).

While the record contains multiple drafts of agreements between Flanagan and Flexi-Van, none of them had been signed. The operative contract is the one Xtra assigned to Flexi-Van in 2004. Flexi-Van breached this agreement by not paying for the work Flanagan performed and invoiced. Flexi-Van's reasons for not paying are waived, insubstantial, or speculative; damages and offsets must be predicated on generalizations from inadequate data or wrong data.

10. *Sworn Account.*

To recover under the Texas law on sworn accounts, Flanagan must show that (a) it rendered the services promised; (b) it charged the agreed-upon prices; and (c) the account remains unpaid. *Thorp v. Adair & Meyers*, 809 S.W.2d 306, 307-308 (Tex. App. – Houston [1st Dist.] 1991).

Flanagan has shown that it charged the rates adopted in the amended tariff for work it had done. Flexi-Van does not dispute that it has not paid its balance due.

11. *Quantification.*

Under either legal theory – breach of contract or sworn account – Flexi-Van owes Flanagan $527,352.25 plus interest for its work. The amount is derived from the aged receivables report attached to the original petition of $560,458.85 less $28,791.20 Flexi-Van has since paid and an agreed credit of $4,315.40.

Because Flanagan prevailed on its breach of contract claim, Flexi-Van also owes it reasonable attorney's fees. Tex. Prac. & Rem. Code §38.001, *et seq.* A hearing will be set to determine the reasonable amount of attorney's fees Flanagan incurred.

12.     *Conclusion.*

Flexi-Van Leasing, Inc., must pay James J. Flanagan Shipping Corporation for its work and attorney's fees.


Signed on February 15, 2011, at Houston, Texas.


                                        Lynn N. Hughes
                              United States District Judge